UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Larry J. Schrader,                              Bankruptcy No. 05-32516
                                                Chapter 7
          Debtor.
_____/

Kip M. Kaler, as Bankruptcy Trustee,

          Plaintiff,

          vs.                                  Adversary No. 06-7028

Larry J. Schrader,

          Defendant.
_____/

**MEMORANDUM AND ORDER**

      By complaint filed March 1, 2006, Kip M. Kaler, the bankruptcy trustee in this case, initiated this adversary proceeding seeking a determination that Debtor/Defendant Larry J. Schrader is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4) and (5). Defendant filed an answer on March 31, 2006, denying the allegations.

      The matter was tried on June 29, 2006. The following constitutes the court's findings of fact and conclusions of law.

I. FINDINGS OF FACT

      This case involves Defendant's conduct with respect to his assets prior to his bankruptcy filing on October 7, 2005. Defendant's wife, Judy Schrader, is not a co-debtor in this case.

A.  Nichole Schroeder

Defendant met Nichole Schroeder in December 2004 at a hotel bar in Minneapolis. She told Defendant what he characterized as a "sob story" about her husband and son having been killed, and convinced him to give her two or three thousand dollars to pay bills so she would not go to jail.[1] Over the next several months, Defendant wrote Schroeder numerous checks for thousands of dollars because, he testified, he was drinking heavily at the time, he believed her, and he felt sorry for her. Defendant also gave Schroeder permission to use one of his credit cards, and she obtained and used – unbeknownst to him – another credit card in his name that he found out about only when he received the first bill. Defendant also wrote a $65,035.00 check on March 12, 2005, payable to Finley Motor for two vehicles for Schroeder.[2]

On April 19, 2005, Schroeder wrote Defendant a $211,000.00 check to repay him, but the check bounced. Defendant testified that he continued to believe that Schroeder would "make it good" until he received a telephone call from someone who similarly had been swindled by Schroeder. Defendant testified he realized only then that Schroeder was a scam, and on May 24, 2005, he filed a summons and complaint against Schroeder in state court. Defendant obtained a judgment of $211,135.40 against Schroeder. Defendant acknowledged he exercised poor judgment in advancing Schroeder money and letting her use his credit.

---

[1] Defendant did explain why Schroeder allegedly needed money to avoid incarceration.

[2] Defendant did not explain why Schroeder needed two vehicles.

2

B.      Defendant's Financial Accounts and Prepetition Transactions

On May 13, 2005, Defendant withdrew the $3,287.36 balance from a First National Bank joint checking account (#141938) and closed the account. He testified he deposited the money into a State Bank & Trust joint checking account (#145277).

On the same day, Defendant redeemed a $25,000.00 First National Bank certificate of deposit (CD).  He had purchased the 30-day money market CD on August 10, 2004 with a bonus he had received from his employer, ConAgra.  First National Bank issued him a cashier's check in the amount of $10,852.33, and applied $13,339.98 toward a loan.  Defendant initially testified that the rest of the $25,000.00[3] from the CD was used to pay off his ready reserve account.  When he was reminded that he did not have a ready reserve account at First National Bank, he testified that he must have been penalized for cashing the CD before it matured.  However, the CD was a 30-day CD and stated, "Your account matures on September 9, 2004."  The account automatically renewed upon maturity with a 10-day grace period to withdraw without penalty, and interest was credited and compounded monthly.  In any event, Defendant testified he did not get any money from the CD other than the payment on the loan and the cashier's check.

Also on May 13, 2005, Debtor deposited the $10,852.33 cashier's check representing the partial proceeds from the CD into a Wells Fargo joint savings account (#865-7831221) that he and Judy had opened one week earlier. On September 23, 2005, Debtor closed this joint savings account and transferred the $10,052.87 balance to a Wells Fargo savings account (#865-7831718) in only

---

[3]  $ 25,000.00
  -  13,339.98
  -  10,852.98
     $     807.04 (not including interest)

3

Judy's name. Defendant admitted that the money had been jointly owned by Judy and him until he transferred it to Judy. Defendant testified he transferred the money to Judy because she had loaned him money over the years from an inheritance she received from her father, and Defendant wanted to protect the money from his creditors.

Defendant and Judy had another Wells Fargo joint checking account (#858-1018754). Defendant's and Judy's social security payments were deposited into this account, as were Defendant's pension payments. Upon Defendant's bankruptcy filing on October 7, 2005, this account was frozen. In April 2006, a Wells Fargo representative called Defendant and told him the account had been unfrozen. Defendant withdrew the $8,971.66 balance even though he had only exempted $3,934.95 in his bankruptcy. He felt it was his because it consisted of his social security income, veterans benefits and retirement. He used the money to pay his attorney and other expenses.

Defendant and Judy also had an Edward Jones joint account (#842-05515-1-0). In 1995, Defendant's mother transferred her assets totaling approximately $80,000.00 to this joint account because, according to Defendant, "her mind was getting bad on her." Defendant's mother had approximately $40,000.00 in bills, and Defendant borrowed against their new Edward Jones account to pay off the bills. Defendant testified that the money his mother transferred belonged to both him and Judy because Judy had cared for his mother and promised to pay her funeral expenses. One month prior to his bankruptcy filing, Defendant transferred all but approximately $300.00 from the joint account to an Edward Jones account (#842-10003-1-9) solely in Judy's name. Again, Defendant cited his sense of obligation to Judy for giving him money in the past and his desire to protect the money from his creditors as the reasons for the transfer. Also again, Defendant admitted the money had been jointly owned by Judy and him until he transferred it to Judy. Defendant

4

testified that he ultimately closed the joint Edward Jones account (#842-05515-1-0) prior to his bankruptcy filing.

On October 1, 2005, the account balance in Judy's Edward Jones account was $33,918.33. On October 7, 2005, the date of Defendant's bankruptcy filing, he transferred $15,985.00 from Judy's Edward Jones account to the Wells Fargo joint account (#858-1018754), and then withdrew $15,000.00 from the joint account in the form of cashier's check payable to University of Minnesota Fairview Hospital. Judy was scheduled to have surgery on October 10, 2005, and the hospital demanded payment before it would admit her. Defendant gave the cashier's check to the hospital to cover Judy's medical expenses. Some of the funds in Judy's Edward Jones account were also used to pay for Defendant's mother's funeral in June 2006. On June 28, 2006, approximately $10,000 remained in the account, and the Court ordered it turned over to the trustee as property of the estate.

In the months before his bankruptcy filing, Defendant made numerous purchases and payments. He bought two gifts for Judy: on March 22, a $925.50 necklace for Christmas 2005, and on August 17, a $564.44 chest for their wedding anniversary in October. His payments to creditors included: on August 9, $2,000.00 to Chase; On August 10, $2,000.00 to American Express; on August 11, $1,000.00 to U.S. Bank; on August 12, $650.00 for a vacuum he owed a creditor; on August 27, $1,500.00 to Straus Clothing.

C.     Defendant's Other Prepetition Conduct and Circumstances

Defendant's employment was terminated in June 2005 when ConAgra discovered that Defendant had been selling its inventory for three or four years and depositing the proceeds into his personal bank accounts at Hawley Bank and Farmers & Merchants State Bank. Defendant testified he kept little of the money he received from selling ConAgra's inventory because he bought

5

$120,000 worth of equipment for ConAgra. He did not keep any records, and he has no idea how much he owes ConAgra.[4] As part of his scheme, Defendant paid Dee Gee Trucking to haul the inventory from ConAgra. He gave Dee Gee Trucking checks for $1,200.00 on June 21, 2005, and $7,526.03 on August 10, 2005.

Defendant testified that in the few months between his termination from ConAgra and his first pension payment, he did not have any income and had to use cash from his various accounts to pay living expenses.[5] For example, throughout June 2005, Defendant wrote checks for large amounts of cash totaling several thousand dollars from his Farmers & Merchants State Bank account. He also closed a Smith Barney account and used the $8,400.00 balance to "pay bills."

Aside from citing living expenses in general, Defendant was unable to account for the money he spent during that time period. He conceded, however, that many of the checks were for drinks for himself and others at a bar he visited regularly. He had been drinking heavily for 8-10 years, and during the time period at issue, he drank every day to get drunk. He also took Paxil for depression. Defendant testified that his drinking and medication clouded his judgment and impaired his memory.

D.   Defendant's Bankruptcy

Defendant filed his bankruptcy petition on October 7, 2005, and his schedules and statement of financial affairs on November 7, 2005. Defendant testified that he read his petition and statement of financial affairs before signing them, and that he considered them to be true and correct to the best of his knowledge.

---

[4] ConAgra did not seek nondischargeability of any outstanding debt owed by Defendant.

[5] The Court notes, however, that Defendant was receiving $1,607.80 per month in social security payments and veterans benefits. Judy received a monthly social security payment of $603.00.

6

In his statement of financial affairs, the section addressing payments to creditors states, "List all payments on loans, installment purchases of good or services, and other debts, aggregating more than $600 to any creditor, made within **90 days** immediately preceding the commencement of this case." Defendant checked "None." He likewise checked "None" under the portion that states, "List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." Defendant testified he did not think any of the payments he had made to creditors needed to be listed.

The section of the statement of financial affairs addressing gifts states, "List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient." Defendant listed a $550.00 contribution to a church, but not the gifts he bought his wife. He testified he did not think they needed to be listed.

The section addressing other transfers states, "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case." Defendant listed the $15,000.00 he withdrew from the Edward Jones account to pay for Judy's surgery.

The section addressing closed financial accounts states:

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions.

7

Defendant listed his First National Bank account and stated that the $10,000.00 in the account at the time of closing was Judy's inheritance. He clarified at trial, however, that they had actually spent Judy's inheritance from her father, and he thought she should have it back. He said he considered it repayment of a loan from Judy. Defendant conceded that his characterization of the $10,000.00 as Judy's inheritance was deceptive because it did not accurately describe what had happened. Defendant did not disclose the closure of the Wells Fargo joint account (#865-7831221) but in one breath claimed that the omission was an oversight, and in another breath conceded that the omission was to prevent his creditors from getting his money. He likewise conceded that he closed the Edward Jones joint account and omitted it from his statement of financial affairs to keep his creditors from getting the money. Defendant testified he believed he listed everything he thought he had to and "pretty much" everything he had an interest in, but he conceded that he had shuffled money among the various accounts to make it look like the money was Judy's.

## II. CONCLUSIONS OF LAW

The trustee seeks to have Defendant denied a discharge under 11 U.S.C. § 727(a)(2), (3), (4) and (5). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

>(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
>(4) the debtor knowingly and fraudulently, in or in connection with the case—
>
>>(A) made a false oath or account;
>>
>>(B) presented or used a false claim;
>>
>>(C) gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money, property or advantage, for acting or forbearing to act; or
>>
>>(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;
>
>(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a).

Denying a debtor a discharge is a drastic remedy. Kaler v. Geller (In re Geller), 314 B.R. 800, 806 (Bankr. D.N.D. 2004). In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party with the burden of proof resting squarely upon the latter. Id. The standard of proof is a preponderance of the evidence. Id.

A.    Section 727(a)(2)

The elements essential to barring a discharge under section 727(a)(2)(A) are:

(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal,

9

>destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

Korte v. United States (In re Korte), 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001); Kaler v. Craig (In re Craig), 195 B.R. 443, 449 (Bankr. D.N.D. 1996). The elements under section 727(a)(2)(B) are substantially the same except that the plaintiff must prove that the debtor transferred or concealed property of the estate after the bankruptcy petition was filed. Fokkena v. Juehring (In re Juehring), 332 B.R. 587, 591 (Bankr. N.D. Iowa 2005).

Defendant's conduct at issue under section 727(a)(2)(A) is the transfer of his interest in the joint Wells Fargo and Edward Jones accounts (#865-7831221 and #842-05515-1-0, respectively) to Judy. Defendant made both transfers within one year of his bankruptcy, and the first three elements are easily met. Debtors rarely admit to a fraudulent intent, and parties seeking denial of debtor's discharge must generally rely on a combination of circumstances that suggest that debtor harbored the necessary intent. In this case, however, Defendant admitted that he transferred the accounts because he wanted to keep the money from his creditors. The fact that he had another, more benign reason (his sense of obligation to repay Judy), does not negate his fraudulent intent.

Although Defendant's admission satisfies the intent element under section 727(a)(2)(A), his intent to defraud is further established by inferences drawn from his course of conduct. Courts consider several factors in determining whether a debtor acted with intent to hinder, delay or defraud: (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of

10

conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry. MWI Veterinary Supply Co. v. Rodgers (In re Rodgers), 315 B.R 522, 531 (Bankr. D.N.D. 2004). Although the Court will not belabor the point, Defendant's conduct in transferring the accounts to Judy meets many of these considerations and further establishes his intent to defraud his creditors.

Defendant's conduct at issue under section 727(a)(2)(B) is the withdrawal and use of the nonexempt funds from the Wells Fargo account (#858-1018754) in April 2006. Defendant transferred property of the estate after his bankruptcy was filed, and again, the first three elements are easily met. Although Defendant did not admit that he withdrew the money to keep it from his creditors, considering the factors listed above, Defendant's course of conduct draws the inference of his intent to defraud.

Denial of discharge is warranted under section 727(a)(2)(A) and (B).

B.  Section 727(a)(3)

A debtor may be denied a discharge pursuant to section 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified under all the circumstances of the case. Riley v. Riley (In re Riley), 305 B.R. 873, 882 (W.D. Mo. 2004). Intent is not an element of this ground for denial of discharge; the standard imposed is one of reasonableness. Id. Discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition. Id. Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them. Grisham Farm

11

Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005). The complaining party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions. Id. If the debtor breaches his duty to his creditors to keep adequate records, he is given the opportunity to provide some justification for the breach. Id. If the debtor cannot justify his failure to keep adequate records, his discharge will be denied. Id.

Defendant failed to keep any records pertaining to the flow of money from his sales of ConAgra's inventory or his alleged reinvestment of the proceeds back into ConAgra. He also failed to keep account ledgers for his various accounts identifying the transactions he made. Although his bank statements provide basic information regarding his accounts, they show numerous deposits and withdrawals without any information as to the source or disposition of the funds. Defendant's failure to keep adequate records makes it impossible to ascertain his financial condition and transactions, and he offered no justification for his failure. Accordingly, denial of discharge is warranted under section 727(a)(3).

C.   Section 727(a)(4)

A debtor may be denied a discharge pursuant to section 727(a)(4)(A) if the debtor knowingly and fraudulently, in or in connection with a case, made a false oath or account. In order to deny a discharge to a debtor under this subparagraph, a plaintiff must establish that: (1) the debtor knowingly and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4) regarding a material matter. Korte v. United States (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001). A debtor's signatures on the petition, made under penalty of perjury, are declarations which have the force and effect of oaths of the kind encompassed by the discharge exception for

making a false oath.  Jordan v. Bren (In re Bren), 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) (overruled on other grounds).  The proper functioning of the entire bankruptcy process is dependent upon debtors providing complete, accurate and reliable information in the petition and other documents submitted with the filing of the case so that parties in interest may evaluate debtors' assets and liabilities and appropriately administer the case.  Id.

At issue here is whether Defendant "knowingly and fraudulently" made a false oath.  As in section 727(a)(2) cases, an admission or other direct evidence of fraudulent intent is rarely available in section 727(a)(4) cases.  Defendant conceded that his characterization of the $10,000.00 in the closed First National Bank account as Judy's was deceptive because it did not accurately describe what had happened.  In fact, when Defendant closed the First National Bank account it only had a balance of $3,287.36.  Defendant admitted that he intentionally shuffled money among his and Judy's accounts to make it look like the money was Judy's.  Moreover, Defendant admitted that he omitted his closure of the Wells Fargo and Edward Jones joint accounts to prevent his creditors from getting the money.  In short, Defendant admitted that he knowingly and fraudulently made a false oath.

Courts are often understanding of a single omission or error resulting from an innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth, which is the functional equivalent of intent to deceive.  Kaler v. Geller (In re Geller), 314 B.R. 800, 807 (Bankr. D.N.D. 2004).

Defendant's omissions were legion.  In addition to his failure to list the closed accounts already discussed, Defendant also omitted the closed Smith Barney account.  Next, he failed to disclose numerous payments of more than $600 to creditors within 90 days of his bankruptcy,

13

including $2,000.00 to Chase, $2,000.00 to American Express, $1,000.00 to U.S. Bank, $650.00 for a vacuum replacement, $1,500.00 to Straus Clothing, and $7,526.03 to Dee Gee Trucking. He also omitted the two gifts for Judy that clearly exceeded a total of $200.00. Lastly, Defendant did not disclose any of the $211,000.00 he transferred to Schroeder. Defendant pleaded ignorance, but Court is firmly convinced that Defendant's litany of omissions were not the result of an innocent mistake.

Denial of discharge is warranted under section 727(a)(4).

D.     Section 727(a)(5)

Section 727(a)(5) of the Bankruptcy Code denies a debtor a discharge if he or she has failed to explain satisfactorily any loss or deficiency of assets to meet his or her liabilities. Section 727(a)(5) does not contain an intent element as part of its proof, and what constitutes a "satisfactory" explanation is left to the discretion of the Court. Riley, 305 B.R. at 885. As the party objecting to discharge, the trustee has the burden of proving that a loss of assets actually occurred. See id. Once that burden has been met, it is incumbent upon Defendant to provide a satisfactory explanation for the loss of the asset. See id.

The trustee has shown that Defendant lost thousands of dollars in the months preceding his bankruptcy. Defendant's vague explanation was that he spent the money on living expenses and alcohol. He blamed his drinking and medication for his inability to recall with any specificity where the money went. The Court deems Defendant's explanation unsatisfactory, and denial of discharge is warranted under section 727(a)(5).

14

Based on the foregoing, Debtor/Defendant Larry J. Schrader is denied a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2), (3), (4), and (5).

**SO ORDERED.**

Dated this August 11, 2006.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**